## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SUNIL M. MALKANI, NICHOLAS MATARAGAS, and RED DRAGON PARTNERS, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2020-1004-SG |
| GEMMA CUNNINGHAM a/k/a GEMMA TURI, CHARLES D. ROSEN, GARY WILSON, and TRUTHMD, LLC, a Delaware limited liability company, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

Date Submitted: November 2, 2022
Date Decided: January 31, 2023

Philip Trainer, Jr., Marie M. Degnan, and Randall J. Teti, of ASHBY & GEDDES, Wilmington, Delaware; OF COUNSEL: Marcos D. Jimenez, of MARCOS D. JIMENEZ, P.A., Miami, Florida, *Attorneys for Plaintiffs*.

Ryan P. Newell, Lakshmi A. Muthu, Tara C. Pakrouh, and Michael A. Carbonara, Jr. of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Michael C. Heyden, Jr. and Joseph E. Brenner of GORDON REES SCULLY MANSUKHANI, LLP, Wilmington, Delaware, *Attorneys for Defendants*.

**GLASSCOCK, Vice Chancellor**

This matter seeks enforcement of a contract between a private investor and a Delaware LLC. The Plaintiff-investor is Dr. Sunil Malkani; the LLC is Defendant TruthMD. Over twenty years ago, in an influential paper, La Porta *et al.* posited that the differing rates of success among common law economies can be explained based upon the relative abilities of parties, particularly investors, to protect and enforce their rights via contract.[1] To that proposition can perhaps be appended a paraphrase of Nelson Algren's famous "Rules of Life": never eat at a place called Mom's, never play poker with a man called Doc, and be careful investing in a business called Truth.[2]

The facts here, post-trial, demonstrate a different method of investing: put the money in first; work the details out later. A testament to the felicity of that strategy, for both investor and investee, is presented below, in which mixed results obtain.

## I. FACTUAL BACKGROUND[3]

Defendant TruthMD (the "Company") is a Delaware LLC founded in 2012 by Defendants Gemma Cunningham and Dr. Charles Rosen, a married couple,

---

[1] *See generally* Rafael La Porta, et al., *Legal Determinants of External Finance*, 52 J. of Fin. 1131 (1997).

[2] *See generally* Nelson Algren, *A Walk on the Wild Side* (1956).

[3] Citations to the parties' joint trial exhibits are referred to by the numbers provided by the parties and cited as "JX __". *See* Updated Final Joint Trial Exhibit List, Dkt. No. 195. Citations to the parties' stipulated pre-trial order are cited as "PTO ¶ __". Pretrial Stipulation and [Proposed] Order, Dkt. No. 173. References to the trial transcript are cited as "Tr. __:__". Tr. of 4-18-2022 Trial – Volume I, Dkt. No. 183; Tr. of 4-19-2022 Trial – Volume II, Dkt. No. 184.

together with non-party Dr. Kourosh Maddahi.[4]  The Company aggregates data on healthcare providers, including their training, sanctions, exclusions, medical malpractice suits, and conflicts, allowing it to provide comprehensive data solutions to managed care organizations, insurers, and government agencies in the United States through its product MedFax.[5]

TruthMD is run by a board of managers (the "Board"), which currently includes Defendants Cunningham, Rosen, Gary Wilson, and non-party Morgan St. John.[6]  In addition to their roles as managers, Cunningham has served as CEO and Rosen as Chief Medical Officer since the Company's founding.[7]  Similarly, Wilson has served as the Company's Chairman since at least 2017,[8] while St. John has acted as a financial adviser to the Company since its inception.[9]

Plaintiff Sunil Malkani is an ophthalmologist based in Fort Meyers, Florida.[10]  He is the founder, owner, and sole physician of Malkani Retina Care.[11]  Dr. Malkani was introduced to TruthMD in 2016 by Shailesh Gupta, who is the principal of Plaintiff Red Dragon Partners, LLC.[12]  Late that year, impressed with

---

[4] PTO ¶ 18; JX 267 14:10-16:5.
[5] DF Pre-Trial Br. at 5-6; PTO ¶ 17.
[6] PTO ¶¶ 22-24; DF Pre-Trial Br. at 8. Over the years, other individuals have served on the Board, but these four managers are central to the issues at dispute here. PTO ¶¶ 25-26.
[7] PTO ¶¶ 22-23.
[8] *Id.* ¶ 24.
[9] JX57 at 1; Tr. 258:1-19.
[10] JX 286 at 267:22-268:23; DF Pre-Trial Br. at 9.
[11] JX 286 at 268:21-269:9
[12] *Id.* at 289:16-24; DF Pre-Trial Br. at 10.

the Company's ability to provide critical information to the healthcare industry,[13] Malkani purchased three Series E preferred units for $498,000.[14] The events that followed form a set of facts that are the basis of the dispute among the parties, as adduced at trial. As the reader will see, the parties negotiated investment terms piecemeal as Malkani's money poured into the Company.

*A. April 2017 to November 2018*

In April 2017, Cunningham and Malkani began to discuss the possibility of additional funding in the form of a line of credit.[15] Early the following month, the Board formally authorized Cunningham to negotiate on the Company's behalf, giving her the ability to "execute all documents and take all action that she deemed necessary or advisable to consummate the transactions."[16] Cunningham and Malkani then began the negotiation of a $1,000,000 revolving line of credit.[17] However, Cunningham indicated that the Company needed cash quickly, and Malkani was willing "to get creative and get [the Company's] capital needs met[.]"[18] As a result, on May 26, 2017, Malkani advanced the Company $166,000 (the "2017 Advance") to be tied with a future warrant, details of which the parties' attorneys

---

[13] JX 268 at 14:5-13.
[14] JX 1 at 7; PTO ¶ 28.
[15] *See generally* JX 4 (documenting Malkani and Cunningham's texts from April 2017); JX 5; Tr. 7:5-9:4.
[16] Tr. 281:3-9, 282:5-11; JX 11 at 2.
[17] PTO ¶ 30; JX 14 at 1-5.
[18] JX 9 at 68-69, 143.

could work out later.[19] The credit line negotiations subsequently fell apart,[20] but the Company did not return the 2017 Advance.[21]

In October 2018, Cunningham reached out to Malkani regarding the Company's issuance of Series-F preferred units, raising the possibility of rolling the 2017 Advance and accrued interest into the new equity offering.[22] Subsequent negotiations resulted in the consolidation of the 2017 Advance ($166,000), its accrued interest ($22,132), and an additional $311,868 advance into a note convertible into two Series-F preferred units at a price of $250,000 per unit (the "2018 Note").[23]

*B. December 2018 to March 2020: Malkani Advances $980,000 More*

Between December 2018 and March 2020, Malkani made seven additional advances to the Company, totaling $980,000.[24] During this period the parties, including through their respective attorneys, made several fruitless attempts to formalize loan agreements in what became an evolving tug-of-war between the Company's constant need for capital and Malkani's increasing demands for safeguards.[25]

---

[19] PTO ¶ 31; JX 9 at 136-39, 142.
[20] JX 13 at 1-16; Tr. 8:20-9:20.
[21] Tr. 9:21-23; *see* JX 20 at 1 (Cunningham acknowledging in October 2018 that the Company still held the 2017 Advance).
[22] JX 19 at 1.
[23] JX 26; JX 25; Tr. 203:16-20, 441:11-442:20.
[24] PTO ¶¶ 34, 36-37, 40, 43-45.
[25] *See, e.g.*, JX 37 at 1; JX 46 at 1; JX 294 at 1.

On April 9, 2019, Malkani's counsel, John Crivelli, proposed documents that would govern both previous and forthcoming advances.[26] Based on precedent forms provided by TruthMD's attorney, Curt Barwick, these redlined documents included a draft purchase agreement and a draft note.[27] Critically, these documents contained three provisions (collectively, the "Disputed Provisions") intended to safeguard Malkani's investment.[28] The purchase agreement contained a change-in-control provision (the "CIC Provision"), which provides in part that "[t]he Company shall not change its ownership, control or management structure during the term of the Consolidated Note" without Malkani's prior written consent.[29] The purchase agreement also contained a "most-favored nation" provision (the "MFN Provision"), which requires the Company to (1) provide Malkani with written notice upon the issuance of subsequent debt and (2) allow him to amend his outstanding note to incorporate any terms from the new issuance that he deems favorable.[30] The third Disputed Provision was a debt-to-equity conversion formula (the "Conversion Formula") contained in the draft note, which dictates the valuation method and procedure under which the note would convert to equity following the Company's sale or certain subsequent capital raises.[31]

---

[26] JX 59 at 1.
[27] JX 59; Tr. 307:17-310:2, 397:16-398:8.
[28] Tr. 20:21-21:9, 25:16-26:23.
[29] JX 59 at 24-25.
[30] JX 59 at 28.
[31] JX 59 at 10-11.

On April 13, 2019, Cunningham sent Malkani revised drafts that had been reviewed by Barwick, notably omitting the Disputed Provisions.[32] Apparently at an impasse, substantive negotiations ceased until November, when Cunningham informed Malkani that the Company was potentially going to be acquired and that "it might be good to get the monies you do have in the company organized – as at the moment I have them on the books as a loan."[33]

Thereafter, Cunningham suggested that Malkani "move a set of a drafts along ASAP to get the process started."[34] On January 29, 2020, Crivelli (on Malkani's behalf) reengaged with Barwick by recirculating versions of the draft purchase agreement and draft note that contained the Disputed Provisions.[35] While these inclusions were not highlighted, Crivelli explicitly noted to Barwick that he "was not sure which note and purchase agreement to use as a base for a redline, and so [he] figured [the Company] could decide that internally."[36]

Malkani and Cunningham discussed these drafts a week later.[37] Cunningham followed up with an email memorializing her understanding of the conversation, noting that "[w]e also agreed that we cannot give you the right to approve the sale

---

[32] JX 61.
[33] JX 70.
[34] JX 81 at 1.
[35] *Id*. at 3-4, 18, 22.
[36] *Id*. at 1.
[37] PTO ¶ 42

of the company or any part of the company."[38]  In his reply, Malkani did not explicitly disagree with Cunningham's stance on control, suggesting instead that the parties could "work through" it.[39]  The two spoke again on February 17, with Cunningham following up via text that she felt "really good after our call last night. It's like we finally broke through[,]" to which Malkani replied, "yes, same here."[40]

The next week, Crivelli sent Cunningham and Barwick drafts of the purchase agreement and note, which incorporated updates from a previous conversation between the two attorneys.[41]  This email also mentions warrants tied to specific milestones, under which the Company would grant Malkani the right to purchase a set number of equity units.[42]  These warrants would become a second major area of dispute, in addition to the Disputed Provisions.

On March 4, Barwick replied to Crivelli with revised drafts of the purchase agreement and note, as well as initial warrant drafts.[43]  In the body of the email, Barwick wrote, "[t]he [C]ompany believes that the changes to your February 26th drafts of [the purchase agreement and note] are clarifying and minor.  There are no

---

[38] JX 85 at 1.

[39] JX 86 at 1. Malkani clarified at trial that he did not agree with Cunningham's position on the CIC Provision. Tr. 52:19-54:6.

[40] JX 292 at 90-91.

[41] JX 93. Plaintiffs contend that these revisions included the Disputed Provisions, but the email's attachments were not entered into evidence. *See*, *e.g.*, Pl.'s Post-Trial Opening Br. 23 n.88 (citing to JX 306, which appears in the Joint Trial Exhibit List, but not the exhibits provided to the Court) ("PL PTOB").

[42] JX 93.

[43] JX 98.

other comments or changes that I am aware of."[44]   Barwick's revised purchase agreement draft contained both the CIC and MFN Provisions, while his revised note draft contained a revised Conversion Formula.[45]

Crivelli followed up two days later highlighting three "open business/legal points that require input from the business principals to resolve[,]" including reverting the Conversion Formula to an earlier iteration proposed by Malkani.[46] Barwick replied later that day indicating that Cunningham and St. John had agreed to all three points and that "[w]ith that, I think we are in agreement.  Please make the changes and send out execution versions."[47]

The following Monday, the parties spoke by phone.[48]   Once again, Cunningham followed up with an email summarizing the discussion.[49]  She clarified that the Company was contemplating warrants for 12 units tied to both the closing of the parties' current loan consolidation and, in part, to Malkani achieving the milestone of $2,000,000 in loans to the Company.[50]  That evening, Crivelli sent Barwick updated drafts of the purchase agreement and note, once again containing the Disputed Provisions, as well as two draft warrants.[51]  One warrant for nine units

[44] *Id*. at 1.
[45] *Id*. at 21, 59, 63.
[46] JX 100 at 2.
[47] *Id*. at 1.
[48] JX 101.
[49] *Id*.
[50] *Id*.
[51] JX 103.

8

would be exercisable upon closing of the loan consolidation, while the remaining three-unit warrant would be contingent upon the additional post-closing funding needed to reach $2,000,000 in loans.[52]

The following afternoon, Barwick replied that "we are in agreement in most respects," taking exception only to a provision in the warrants that Malkani subsequently agreed to remove.[53] That evening, Crivelli sent a proposed side letter, meant to accompany the previous day's drafts, that threw a temporary wrench in the works.[54] The side letter sought to leverage the loan consolidation to give Malkani broad protections by, among other things, limiting Cunningham and Rosen's ability to issue additional equity or grant members certain rights adverse to Malkani's interests.[55] Shortly thereafter, Cunningham texted Malkani that "the side letter is not what we agreed to."[56] In a subsequent email, Cunningham indicated that she was prepared to sign the draft warrant and accompanying paperwork, but asked Malkani to give her a call about the side letter.[57] The side letter was never executed.[58]

The next day, March 12, 2020, Barwick emailed Crivelli a draft of the nine-unit warrant that tweaked the definition of fair market value to align with the

---

[52] *Id.* at 1, 5-22, 75-92.
[53] JX 102 at 1; JX 107 at 1-2.
[54] JX 104 at 1, 21-22.
[55] *Id.* at 21-22.
[56] JX 95 at 101.
[57] JX 106.
[58] JX 286 at 360:12-362:14.

Company's past practice, concluding that "[i]f this is acceptable, then I think we are done."[59] Cunningham followed up with a text to Malkani that read, in part, "I think we are there. Call me so we can discuss and finally move on[.]"[60]

On March 13, Cunningham emailed Malkani signed copies of the note, purchase agreement, and nine-unit warrant, adding "[s]o excited we finally got this done."[61] These documents (the "March 13 Consolidation"), which contained the Disputed Provisions, were initialed by Cunningham on each page.[62] Malkani texted Cunningham that the documents "will need cleanup when" Barwick gets back from vacation and that a "stack of docs" remained to be signed off on.[63] Later that day, pursuant to the terms of the purchase agreement, Malkani wired $162,132 to TruthMD's bank account.[64] Cunningham confirmed receipt by text.[65]

*C. After March 13, 2020, Malkani Advances an Additional $380,000*

March 13, 2020, was also the day on which the United States declared the emerging COVID-19 pandemic a national emergency.[66] The subsequent stay-at-home orders brought with them significant uncertainty for American businesses.

---

[59] JX 107 at 1.
[60] JX 95 at 114.
[61] JX 111. Barwick, Crivelli, and St. John were copied on the email.
[62] *Id*. at 1-39.
[63] JX 95 at 133-34.
[64] JX 113 at 7; PTO ¶ 47.
[65] JX 95 at 137.
[66] *See* CNN, Text of Trump's National Emergency Declaration over Coronavirus, CNN (March 13, 2020), https://www.cnn.com/2020/03/13/politics/trump-nationalemergency-proclamation-text/index.html.

TruthMD was no exception. In the weeks that followed, Cunningham and Rosen pressured Malkani for additional advances to help keep the Company afloat.[67] In response, Malkani made a total of seven additional advances between March and April 2020,[68] bringing the total loan balance to $1,980,000.

In light of these changes, Crivelli reached out to Barwick on April 29, stating:

> My client and I believe it is time to finish the funding and have loan documents correctly executed. Unfortunately, we cannot accept [Cunningham's] signature on a select few of the documents as being sufficient. All of the documents need to be executed with all blanks completed and disclosure schedules attached.[69]

Crivelli also conveyed Malkani's demand for three "business changes": a seat on the Company's board, a three-unit warrant upon reaching $2,000,000 in funding, and read-only access to the Company's bank accounts.[70]

Over the next week, Cunningham and Malkani exchanged a flurry of texts.[71] Malkani sought documentation of his recent advances, together with the formalities (disclosures and Board consents) that had been overlooked in March.[72] In contrast, Cunningham "thought the [March 13] paperwork was done"[73] and contained "all of the signatures that were requested and due[,]" with the exception of the three-unit

---

[67] JX 95 at 158, 203; JX 112 at 195-201; JX 116.
[68] PTO ¶¶ 48-54.
[69] JX 120.
[70] *Id.*
[71] JX 121 at 6, 8, 30-31, 33, 42, 61, 68-70, 85.
[72] JX 127 at 1.
[73] JX 121 at 65.

warrant, which awaited the $2,000,000 milestone.[74]  Once again, the parties found themselves at an impasse that dragged on for months.

### D. TruthMD Explores Another Potential Acquisition

On August 5, 2020, TruthMD entered into an exclusivity agreement regarding a potential $180 million acquisition of the Company.[75]  During due diligence associated with that transaction, the Company acknowledged the validity of the March 13 Consolidation.[76]  The potential windfall apparently helped overcome the previous deadlock, with Crivelli reaching out to Barwick on August 10 to renew the request for the missing disclosure schedules and board resolutions associated with the March 13 Consolidation.[77]  A week later, Cunningham emailed Malkani updated redline drafts of the purchase agreement, note, and three-unit warrant.[78]  Among other revisions,[79] these drafts removed the CIC Provision and MFN Provision, while reverting the Conversion Formula back to a fixed $250,000-per-unit valuation.[80] The next day, Crivelli followed up with Barwick, writing that, although he'd thought

---

[74] JX 123 at 1; JX 121 at 60, 71, 78, 86.
[75] JX 170 at 2; JX 162 at 1.
[76] JX 155 at 1-2.
[77] JX 161.
[78] JX 169 at 1.
[79] The "Existing Notes" figure in August 17 draft of the purchase agreement matches the number in the March 13 agreement, however, the "Existing Advances" number has been updated to account for the intervening loans.  JX 171 at 11.  Defendants claim this as proof that the parties did not consider the earlier agreement binding.
[80] JX 169 at 1, 48, 52.

the previous drafts were the "final form[,]" Cunningham's revisions "seem[ed] reasonable at first glance."[81]

On September 1, Malkani forwarded Cunningham revised drafts that accepted the deletion of the CIC provision but reinserted the MFN Provision and Conversion Formula.[82] Two days letter, Cunningham sent an email memorializing her understanding of a September 1 discussion with Malkani, attaching drafts that once again removed the MFN Provision and fixed the conversion rate to $250,000 per unit.[83] However, this was as close as the parties would get to a final consolidation, as negotiations were soon derailed.

Less than a week later, Malkani texted Cunningham to express concern that the potential transaction would lead to a "large dilution" in his equity interest.[84] Specifically, Malkani worried that the Board was attempting to line its pockets by creating new ownership units[85] or, later, through post-transaction earn-outs and reimbursement for purportedly foregone salaries.[86] Despite Cunningham's repeated assurances that "[t]his is a great deal" and that he "should be very happy[,]"[87] Malkani sought to negotiate a better deal for himself, writing, "I have supported you,

---

[81] JX 171 at 1.
[82] JX 183 at 1, 9, 13, 54.
[83] JX 199 at 1.
[84] JX 184 at 48-49.
[85] JX 236 at 2-4.
[86] JX 229 at 12; *see* JX 302 ¶¶ 65-80.
[87] JX 184 at 72, 74.

and now it's your turn to make sure [I am] taken care of, and I know you are going to do the right thing."[88] Cunningham replied that Malkani had "been great[,] but this is not possible[.]"[89] Instead, Cunningham warned Malkani that "we have yet to agree on terms that would entitle you to convert your loans and receive an equity position in TruthMD."[90]

On October 1, 2020, Malkani's litigation counsel sent the Company a letter alleging that the Board had breached its fiduciary duties and demanding that the transaction be postponed.[91] This litigation resulted.

*E. Procedural History*

Plaintiffs filed their initial complaint on November 21, 2020, seeking, among other direct and derivative relief, both expedition and a temporary restraining order enjoining the pending acquisition.[92] Expedition was granted, along with a restriction that the Company could not undergo a change in control or management without first giving Plaintiffs' counsel 60-days' notice.[93] A subsequent preliminary injunction further memorialized this restriction, pending final resolution of this action.[94]

---

[88] JX 219 at 1.
[89] *Id.*
[90] JX 231 at 1 (emphasis omitted).
[91] JX 236 at 2-4.
[92] *See* Pls.' Opening Br. in Supp. of their Mot. for a TRO, Dkt. No. 1; *see also* Pls.' Mot. for Expedited Proceedings, Dkt. No. 1.
[93] Order Granting Expedited Proceedings, Dkt. No. 24.
[94] Order Granting Pls.' Mot. for Preliminary Injunction, Dkt. No. 67.

Plaintiffs then received leave to amend their complaint,[95] which they filed on June 28, 2021.[96] The amended complaint drops the derivative claims, instead naming the Company as a defendant.[97] In addition to a variety of new factual allegations, the amended complaint also narrowed the seven original causes of action to four: breach of fiduciary duty against Cunningham, Rosen, and Wilson (Count I); specific performance for delivery of a warrant for three additional equity units (Count II); declaratory judgment that the March 13 note and purchase agreement are valid and enforceable (Count III); and breach of contract with regard to the CIC Provision (Count IV).[98]

Defendant Wilson moved for summary judgment on the fiduciary duty claim,[99] however, I denied that motion on the basis that Wilson's potential for liability hinges on a genuine factual dispute.[100] The action was bifurcated, and a trial on Count I was deferred.[101] A two-day trial on Counts II-IV was held in April 2022, and, following post-trial briefing and argument, I took the matter under advisement.

---

[95] Order Granting Pls.' Mot. for Leave to File Verified Am. Compl., Dkt. No. 83.

[96] Pls.' Verified Am. Compl., Dkt. No. 84.

[97] *See Id.*, Ex. 1 (Redline Comparison).

[98] *Id.* ¶¶ 98-119.

[99] Def. Gary Wilson's Mot. Summ. J., Dkt. No. 126; Opening Br. Supp. Def. Gary Wilson's Mot. Summ. J., Dkt. No. 134; Reply Br. in Supp. of Def. Gary Wilson's Mot. Summ. J., Dkt. No. 149.

[100] Letter Opinion Decided April 5, 2022 at 4, Dkt. No. 165.

[101] *See* Order Granting Stipulated and Proposed Second Amended Scheduling Order, Dkt. No. 151.

## II. ANALYSIS

Before me are three causes of action from the amended complaint: Counts II-IV.[102] Plaintiffs have the burden of proving each element of these causes of action by a preponderance of the evidence.[103] This standard of proof requires that the evidence shows that something is more likely than not.[104]

I begin my analysis with Count III, under which Plaintiffs seek a declaratory judgment that the note and purchase agreement comprising, in part, the March 13 Consolidation are valid and enforceable. Finding that they are, I then turn to Count II, for specific performance of the three-unit warrant. Because Malkani has not reached $2,000,000 in principal advanced to the Company, I find that he is not yet entitled to this warrant. Next, I find that Count IV for breach of contract is unripe and that, accordingly, the preliminary injunction must be discharged. Finally, I determine that the parties' requests for attorneys' fees are untimely.

My reasoning follows.

*A. The March 13 Consolidation Is Valid and Enforceable*

The validity of the March 13 Consolidation is the central issue in this action.[105] In Delaware, "a valid contract exists when (1) the parties intended that the contract

---

[102] PTO ¶ 3.

[103] *Physiotherapy Corp. v. Moncure*, 2018 WL 1256492, at *3 (Del. Ch. Mar. 12, 2018).

[104] *Id.*

[105] Defendants raise the issue that Count III of Plaintiffs' amended complaint does not seek a declaratory judgment that the 9-unit warrant is valid and enforceable, as it does for the purchase

16

would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration."[106]  Following trial, the parties' arguments narrowed to the first element, with Defendants contending that Malkani had rejected their terms prior to accepting and, additionally, could not establish a meeting of the minds.[107]

### 1. Malkani Did Not Reject the March 13 Consolidation

The record shows that Cunningham considered the disputed purchase agreement, note, and 9-unit warrant to have been fully executed on behalf of the Company on and after March 13, 2020.[108]  Nonetheless, Defendants assert that they should not be held to the Disputed Provisions within the March 13 Consolidation

---

agreement and note.  PTO ¶ 11; Df.'s Answering Post-Trial Br. 33-35, Dkt. No. 194 ("DF PTAB"). Defendants further argue that consideration of the 9-unit warrant claim is prejudicial, and that the Court should refuse to consider it.  DF PTAB at 34-35 (citing *Merck and Co., Inc. v. SmithKline Beecham Pharms. Co.*, 1999 WL 35793685, at *2 (Del. Ch. Jan. 27, 1999)).  Here, all three documents at issue in Count III were negotiated together and approved as part of a single transaction.  The Company does not dispute any provision within the 9-unit warrant, only the validity of the transaction authorizing it.  As a result, a finding that the purchase agreement and note are valid will inherently extend to the 9-unit warrant as well.

[106] *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1212-13 (Del. 2018) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).

[107] Def.'s Opening Post-Trial Br. 30-41, Dkt. No. 190 ("DF PTOB").  Defendants also argue that, even if the March 13 Consolidation is found valid and enforceable, that I should invoke equity to nullify it.  DF PTOB at 44-46.  I find the Company's arguments that Cunningham would never (and could never) give away a right like the CIC Provision uncompelling given the substantial record to the contrary.

[108] JX 111 (Cunningham sending signed March 13 Consolidation paperwork, stating "[s]o excited we finally got this done."); JX 95 at 137 (Cunningham texting Malkani on March 13, thanking him for wiring funds); JX 121 at 60 (Cunningham on May 7, 2020: "hopefully [Crivelli is] not trying to change the [March 13] deal"), 65 (Cunningham on May 7, 2020: "Seriously I thought the [March 13 Consolidation] paperwork was done. I signed everything when you asked."); JX 123 at 1 (Cunningham confirming signatures on March 13 Consolidation were all "that were requested and due").

because of *their own failure* to sign a stack of ancillary documents.[109]  They argue that, prior to performing, Malkani rejected the core purchase agreement, note, and nine-unit warrant because the ancillary paperwork was not signed.  This is far from the most compelling reading of the record.

In the hours after the Company signed the March 13 Consolidation, Malkani texted Cunningham that the closing documents would "need cleanup once [Barwick] gets back" and that a "stack of [documents]" remained to be signed off on.[110] Defendants contend that these communications constitute a rejection that overrides Malkani's undisputed and contemporaneous performance[111] of his sole obligation under the contract: wiring TruthMD exactly $162,132.[112]  This litigation-driven argument ignores both the lack of explicit rejection in Malkani's communications[113] and the Company's months of post-consolidation conduct evidencing an intent to be bound.[114]  A more straightforward reading, consistent with both Malkani's

---

[109] *See generally* DF PTOB; DF PTAB (arguing that rejection occurred or there was no meeting of the minds, based on the lack of signed ancillary documents).

[110] JX 95 at 133-34.

[111] *See* Tr. 233:5-9 (Cunningham acknowledging that Malkani's sole obligation was to wire the money); PTO ¶ 47.

[112] Tr. 233:5-9; *See generally* JX 111 at 4 (laying out the requirements for closing under the purchase agreement).

[113] To support their rejection argument, Defendants cite inapposite caselaw involving rejections that are far more unequivocal or outright. *See Independence Mall, Inc. v. Wahl*, 2012 WL 6945505, at *4 (Del. Super. Dec. 31, 2012) (contract in question was "rejected outright"); *see also Centreville Veterinary Hospital, Inc. v. Butler-Baird*, 2007 WL 1965538, at *2 (Del. Ch. July 6, 2007) (rejecting party explicitly "told [his counterparty] that he did not accept [the terms]").

[114] JX 121 at 71 (Cunningham texting Malkani on May 7, 2020 "your sudden demand of *minor* paperwork is not going over well" (emphasis added)).  The Company's stance only changed once

18

performance[115] and the Company's response, is that Malkani's texts represent a request that Defendants sign additional ancillary documents that Defendants thought extraneous to the deal.[116]

Under Delaware law a party may accept an offer through performance.[117] Here, the Company has conceded that the only obligation that Malkani had under the March 13 Consolidation was to wire the specific advance of $162,132.[118] It is undisputed that Malkani complied with that obligation.[119] Because the Company's arguments of rejection are based on inapposite caselaw and tenuous readings of the factual record, I find that Malkani's acceptance-by-performance was not preempted by a rejection of the March 13 Consolidation.

### 2. There Was a Meeting of the Minds

Defendants next argue that, even if there was no rejection, a contract could not have been formed because there was no meeting of the minds as to all material terms.[120] Delaware law requires that "all essential or material terms must be agreed

---

the threat of litigation began to emerge. *See* JX 231 (September 24, 2020, email from Cunningham to Malkani stating "we have yet to agree on terms that would entitle you to convert your loans and receive an equity position in TruthMD" (emphasis removed)).

[115] It is unclear whether Malkani's texts precede his performance or vice versa. Pl.'s Post-Trial Answering Br. 6-8, Dkt. No. 193 ("PL PTAB"). Neither party was able to provide conclusive evidence on this point.

[116] JX 121 at 60, 65; JX 123 at 1.

[117] *Eaton v. Eaton*, 2005 WL 3529110, at *6 (Del. Ch. Dec. 19, 2005); *Hunter v. Diocese of Wilmington*, 1987 WL 15555, at *4-5 (Del. Ch. Aug. 4, 1987).

[118] Tr. 233:5-9; JX 267 at 137:11-15.

[119] PTO ¶ 47.

[120] DF PTOB at 37-41.

upon before a court can find that the parties intended to be bound[.]"[121] The determination of what terms are material is done "on a case-by-case basis[.]"[122] A signed contract "generally offers the most powerful and persuasive evidence of the parties' intent to be bound[,]" however, "the court may [also] consider evidence of the parties' prior or contemporaneous agreements and negotiations in evaluating" their intent.[123]

Defendants contend that no meeting of the minds could have occurred because the parties continued to engage in negotiations after the March 13 Consolidation. Plaintiffs respond that Malkani's post-consolidation demands represented an attempt to leverage *new* advances to extract the desired ancillary documents in an *additional* deal, rather than, per Defendants, the continuation of an ongoing negotiation.[124] Indeed, the post-consolidation demands that Defendants allude to are not contemporaneous with the March 13 Consolidation but post-date it by more than a month in the earliest instance.[125] Thus, Defendants' argument glosses over the undisputed fact that Malkani made numerous additional advances, totaling $350,000, in the time period between the March 13 Consolidation and the first of his renewed demands.[126] Given the deference appropriate when a facially valid contract

---

[121] *Eagle Force*, 187 A.3d at 1230.
[122] *Id.*
[123] *Id.* (internal citations omitted).
[124] PL PTAB at 20-22.
[125] DF PTOB at 39 n.215-17, 40 n.225.
[126] PTO ¶¶ 48-54.

exists, I find that Defendants' arguments surrounding renewed negotiations fail to undermine Malkani's evidence of the parties' intent to be bound.

Defendants also assert that there was no meeting of the minds because Malkani never received the ancillary documents he desired, his continued demands for which purportedly prove that those documents contained material terms.[127] "What terms are material is determined on a case-by-case basis, depending on the subject matter of the agreement and on the contemporaneous evidence of what terms the parties considered essential."[128] The documents in question include a security agreement, subordination agreement, guaranty, completed disclosure schedules, and documentation of a board resolution approving the transaction.[129]

Once again, Defendants' argument that these documents contained material terms is undermined by the fact that both parties did not treat them as such. Despite near-daily communications with Cunningham following the March 13 Consolidation, Malkani did not raise the ancillary documents issue again until he had advanced hundreds of thousands of dollars in additional funding to the Company.[130] This sudden drop-off in deal talk allows an inference of Malkani's intent to be bound. Cunningham, for her part, explicitly confirmed that, in the

---

[127] DF PTOB at 39-40.
[128] *Eagle Force*, 187 A.3d at 1230 (citing *Leeds v. First Allied Connecticut Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986)).
[129] DF PTOB at 39.
[130] *See generally* JX 95 at 135-208 (documenting Cunningham and Malkani's text exchanges through 3/31/20); *see also* JX 120 (Crivelli raising the issue of ancillary documents on 4/29/20).

21

Company's view, the March 13 Consolidation contained "all of the signatures that were requested and due[.]"[131]

While absent or incomplete ancillary documents have been held to "cut the other way[,]" in a determination of parties' intent to be bound, they are not dispositive.[132] Here, I find that the parties, implicitly and explicitly, manifested an objective intent to be bound by the terms of the March 13 Consolidation. As a result, I further find that the transaction underlying the March 13 Consolidation gave rise to valid and enforceable contracts in the form of the purchase agreement, note, and nine-unit warrant.[133]

### B. Specific Performance Is Unavailable on these Facts

I turn next to Count II, under which Malkani seeks specific performance for delivery of the three-unit warrant tied to his achievement of $2,000,000 in aggregate funding to the Company. Generally, "[a] party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance."[134] Because Defendants do not dispute that Malkani is entitled to a three-unit warrant

---

[131] JX 125 at 1.

[132] *Eagle Force*, 187 A.3d at 1231.

[133] Once again, I note that my finding on the documents at issue in Count III—the purchase agreement and note—extends to the 9-unit warrant, regardless of the exact pleading in the amended complaint.

[134] *Supernus Pharmaceuticals, Inc. v. Reich Consulting Grp., Inc.*, 2021 WL 5046713, at *3 (Del. Ch. Oct. 29, 2021) (quoting *Osborn*, 991 A.2d at 1158).

upon reaching the funding milestone, I assume for the purposes of this analysis that a valid contract exists.[135]

The following table catalogues Malkani's advances to the Company, without adjustment for any accumulated interest:

| Table 1: Catalog of Malkani's Advances[136] | |
|---|---|
| **Date of Advance** | **Amount of Advance** |
| May 26, 2017 | $166,000 |
| November 19, 2018 | $311,868 |
| December 27, 2018 | $250,000 |
| March 6, 2019 | $200,000 |
| April 3, 2019 | $225,000 |
| January 15, 2020 | $130,000 |
| February 14, 2020 | $50,000 |
| February 18, 2020 | $70,000 |
| March 3, 2020 | $35,000 |
| March 13, 2020 | $162,132 |
| March 16, 2020 | $100,000 |
| March 30, 2020 | $50,000 |
| April 3, 2020 | $60,000 |
| April 9, 2020 | $40,000 |
| April 13, 2020 | $50,000 |
| April 24, 2020 | $50,000 |
| April 30, 2020 | $30,000 |
| **Total** | **$1,980,000** |

Though the stipulated record shows that Malkani has advanced $1,980,000 to date, Malkani contends that accrued interest on funds rolled into the 2018 Note and March

---

[135] DF PTAB at 38.
[136] PTO ¶¶ 31, 33-34, 36-37, 40, 43-45, 47-54.

13 Consolidation counts towards the $2,000,000 milestone.[137] As a result, the question before me is: what did the parties mean by "$2,000,000?"

Malkani argues that the $2,000,000 figure refers to total outstanding loans to the Company. This interpretation allows the Plaintiffs to include the interest that had accrued on various advances before they were rolled into the 2018 Note and March 13 Consolidation. For example, Cunningham described the calculation of the 2018 Note's $500,000 face value as: $166,000 in existing advances, plus $22,132 in accrued interest, plus a new advance of $311,868.[138] Because the notes appear to provide for simple interest on the *total* amount loaned, including the accrued interest due at consolidation, per Plaintiffs, it follows that the accrued interest component is being treated as loan principal.[139] Calculating based on these assumptions, Malkani argues that he unwittingly exceeded the $2,000,000 threshold by more than a quarter million dollars.[140]

---

[137] PL PTOB at 66-69.

[138] JX26. The Company disagrees with Malkani's interpretation, contending that accrued interest was only intended to be included in the calculation of the notes' value for the purpose of conversion into equity. Tr. of 11.2.22 Post-Trial Oral Arg. 78:11-79:8, Dkt. No. 204.

[139] JX 25 at 2. Plaintiffs reason that because interest on existing interest is, by definition, compound interest, the reference to simple interest on the balance reveals that the accrued interest has been rolled into principal. Unavailingly, the note is for an amount, "[n]ot to exceed US$500,000." *Id.* Neither party submitted evidence indicating the amount of interest payments, which would have allowed an inference of how accumulated interest was treated within the note. Subsequent communications between the parties treated the 2018 Note as a loan for $500,000. JX 30 at 1.

[140] PL PTOB at 40-41. Plaintiffs provide no satisfactory explanation for how Malkani, whose contemporaneous communications show his extreme focus on hitting the funding milestone, managed to overshoot the mark to by more than 10%.

Defendants counter that Malkani's interpretation is revisionist and finds no support in the record of the parties' pre-litigation communications.[141] They argue that the parties always understood the milestone to be $2,000,000 in *advances*.[142] Defendants support their position with numerous citations to the record. For example, in the week leading up to the March 13 Consolidation, the parties exchanged texts and emails discussing the 9- and three-unit warrants.[143] Both sides' calculations precisely match Malkani's total advances,[144] but don't include the accrued interest the Plaintiffs now advocate for.[145] Indeed, even the October 1, 2020, letter from Malkani's counsel foreshadowing this litigation calculates total loan principal at $1,980,000, making no mention of the Plaintiffs' current calculation formula.[146]

Having weighed the evidence before me, I find that the Plaintiffs have not proved their interpretation by clear and convincing evidence.[147] In fact, I find it more likely than not that the three-unit warrant obligation has not been met. Malkani seeks

---

[141] DF PTAB at 39.
[142] *Id*. at 39-41.
[143] JX 95 at 59-60; JX 103 at 1.
[144] Once adjusted for their shared oversight of the advance of $50,000 on February 14, 2020.
[145] JX 95 at 59-60; JX 103 at 1.
[146] JX 236 at 2-4.
[147] *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at 6 n.29 (Del. Ch. Jan. 24, 2005).

specific performance, but he has not complied with his investment obligation or demonstrated a willingness, at present, to perform.[148]

### C. The Claim for Breach of Contract Is Unripe

In Count IV of the amended complaint, Plaintiffs allege breach of contract for violation the CIC Provision in connection with the contemplated acquisition.[149] Defendants contend that Malkani waived this claim by failing to argue Count IV in his pre-trial brief or, in the alternative, that the claim is unripe.[150] Because I find that dismissal is merited on ripeness grounds, I need not address the waiver argument.

A dispute will generally be deemed unripe where the underlying claim rests on uncertain or contingent events, the unfolding of which may obviate the need for judicial intervention.[151] True to its name, the CIC Provision prevents TruthMD from undergoing a change in control (or management structure) without prior written consent from Malkani.[152] It does not, however, prevent Defendants from courting potential acquirers or engaging in negotiations.[153] Malkani concedes that that "there is no imminent Acquisition that would currently constitute a breach of the [CIC

---

[148] I note, however, that Defendants have repeatedly expressed willingness to issue a three-unit warrant once Malkani funds an additional $20,000. Tr. of 11.2.22 Post-Trial Oral Arg. at 36:3-20, 81:22-82:12, 83:12-17; Tr. 277:20-278:10, 222:19-223:22.

[149] Pls.' Verified Am. Compl. ¶¶ 117-119.

[150] DF PTOB at 51-54.

[151] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014).

[152] JX 111 at 10.

[153] *Id.*

26

Provision.]"[154]  It is therefore clear that any claim for breach is currently both hypothetical and unripe.

Accordingly, Count IV is dismissed as unripe, with respect to the transaction formerly contemplated.  I must also discharge the preliminary injunction that was issued in conjunction with the contractual right at issue.[155]  However, given my finding in Section II.A that Malkani's rights under the March 13 Consolidation are valid and enforceable, Plaintiffs will not be left without recourse in the event of a future change in control.

*D. The Parties' Attorneys' Fees Requests are Untimely*

Because trial in this action was bifurcated between Counts II-IV, in the initial trial, and Count I, to be tried in the future, I find that adjudication of attorneys' fees at this juncture would be untimely.  I therefore defer consideration of this issue pending resolution of both Count I and any additional disputes between the parties.

## III. CONCLUSION

For the foregoing reasons, Counts II and IV are DENIED.  Count III is GRANTED.  An Order is attached.

---

[154] PTO ¶ 9.
[155] Order Granting Pls.' Mot. for Preliminary Injunction.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SUNIL M. MALKANI, NICHOLAS MATARAGAS, and RED DRAGON PARTNERS, LLC, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 2020-1004-SG ) |
| GEMMA CUNNINGHAM a/k/a GEMMA TURI, CHARLES D. ROSEN, GARY WILSON, and TRUTHMD, LLC, a Delaware limited liability company, | ) ) ) ) ) |
| Defendants. | ) ) |

## ORDER

For the reasons provided in my Memorandum Opinion of January 31, 2023, Plaintiffs' claim for declaratory judgment (Count III) is GRANTED, while the claims for specific performance (Count II) and breach of contract (Count IV) are DENIED. In conjunction with the denial of Count IV, my preliminary injunction of April 21, 2021, is discharged.

IT IS SO ORDERED.

/s/ Sam Glasscock III
Vice Chancellor